DREYFUSS METAL COMPANY, Plaintiff-Appellee, v. ROBERT BERG *et al.*, Defendants-Appellants.—WAYNE-WEBSTER TRADING COMPANY, INC., on Behalf of Itself and all Shareholders of Dreyfuss Metal Company, *et al.*, Plaintiffs, v. CHARLES DREYFUSS *et al.*, Defendants.

First District (6th Division)   No. 1—90—0983

Opinion filed December 28, 1990.—Rehearing denied March 27, 1991.

Daniel S. Hefter & Associates, Ltd., of Chicago (Daniel S. Hefter and Michael R. Goldfein, of counsel), for appellants.

Arnstein & Lehr, of Chicago (Michael R. Turoff and Arthur L. Klein, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Dreyfuss Metal Company (Dreyfuss), brought an action for specific performance against defendants, Robert Berg and Wayne-Webster Trading Company, demanding that they perform their obligations under a "Memorandum of Understanding" in which Dreyfuss agreed to purchase defendants' 50% interest in Dreyfuss and a one-half ownership interest in its Chicago building and land for $1,338,000. The dispute which delayed the closing and prompted this suit resulted from a tax indemnity provision, which Dreyfuss conceded at trial was not part of the original agreement, but which its attorney subsequently added. On February 6, 1990, almost one year after the

agreement was set to close, the trial court entered a decree for specific performance according to the terms of the written agreement dated January 19, 1989. On March 6, 1990, the trial court denied defendants' post-trial motion to require Dreyfuss as a condition of specific performance to compensate defendants for losses which resulted because the closing did not proceed as agreed on February 24, 1989, but rather on April 11, 1990.

On appeal, although defendants contend that specific performance was improperly granted, they do not seek reversal of the decree. Rather, they seek reversal only of the court's order denying defendants' post-trial motion for compensation for losses of interest and for fees.

Plaintiff is a closely held corporation engaged in the scrap metal business. Two shareholders, Dreyfuss Industries, Inc., and Wayne-Webster, each own 50% of Dreyfuss' stock. Dreyfuss Industries, Inc., is an Illinois corporation whose president and sole shareholder is Elsbeth Dreyfuss. Wayne-Webster, a Delaware corporation engaged in the scrap metal business, is owned and operated by Robert Berg, who serves as president. Both Elsbeth Dreyfuss and Berg held seats on Dreyfuss's board of directors. Elsbeth's son, Charles Dreyfuss, served as president and exclusively managed Dreyfuss. Despite Berg's more than 20-year association with plaintiff and his official title as treasurer, Berg never actively participated in the plaintiff's daily operations. He did, however, receive a substantial yearly commission from plaintiff.

In early 1987, Berg indicated to Leonard Kaskel, plaintiff's accountant, his desire to sell his ownership interest in the company. Although Berg made an offer at an October 1987 meeting, the parties did not agree on a price, and negotiations ceased until March 1988, when the parties again met. At this meeting, the parties established the formula for valuing Berg's shares. At the July 1988 board of directors' meeting, Charles Dreyfuss informed Berg that he would no longer receive a yearly commission because he did not actively participate in plaintiff's daily affairs. However, Berg, in his capacity as director, refused to approve the cessation of his commission, thereby causing a deadlock with Elsbeth Dreyfuss on this vote. Berg reaffirmed his desire at this meeting to terminate his association with plaintiff. Due to the continued friction and tension between the parties, they continued to negotiate the terms for plaintiff's purchase of Berg's interest in the company and his resignation as treasurer and director.

On January 19, 1989, the parties met at Berg's request to discuss this matter. Charles and Elsbeth Dreyfuss, Berg, and Kaskel were present. Eventually, the parties agreed to the terms of a deal which Kaskel reduced to a two-page, handwritten "Memorandum of Agreement," which Elsbeth Dreyfuss, on plaintiff's behalf, and Berg, on behalf of himself and Wayne-Webster, signed. The basic terms of the agreement are undisputed: Plaintiff would pay $1,138,000 and a one-half interest in the Dreyfuss building and land in exchange for defendants' 50% shareholder interest. Plaintiff would place $500,000 of the cash payment into an escrow account to fund a potential Dreyfuss liability. The remaining $638,000 would be received by defendants at the closing. The document further provided that plaintiff would rent defendants' one-half interest in the real estate at agreed-upon terms and that defendants would be liable for 50% of the liabilities upon the sale of the building. The parties also agreed that defendants would be responsible for half of any undetermined business liabilities which arose during defendants' period of ownership and that Berg would be bound for five years by a covenant not to compete. Finally, the agreement recited that "a formal contract based upon the above" would be prepared and set February 1, 1989, as the closing date. Despite the provision for a "formal contract," it is undisputed that the parties believed that the written agreement was binding and that they intended the proposed "formal contract" only to memorialize their handwritten agreement in more formal language. Indeed, the trial court found that the handwritten document itself was a valid, enforceable contract.

After the meeting, Kaskel gave the agreement to Martin Kamensky, Dreyfuss' attorney, to draft the formal contract. Kamensky assigned the task to James Shaw, his associate, instructing him to draft a contract reflecting only the agreed upon terms in the "Memorandum of Understanding." Upon completion, Shaw presented the draft to Kamensky, who reviewed it and added the disputed tax liability provision which was not contained in the original handwritten agreement. The provision obligated defendants to indemnify plaintiff for any tax, interest and penalty that plaintiff might be required to pay if the Internal Revenue Service (IRS) disallowed the deduction plaintiff intended to claim for part of the purchase price of defendants' stock.

Kaskel testified that although the parties valued defendants' stock at $1,138,000, plaintiff would report $500,000 as the stock's value and allocate the remaining $638,000 to the covenant not to compete with Berg and compensation for Berg's prior services. By so doing, the $638,000 would be deductible as business expenses. Kaskel testified

that after the January 19, 1989, meeting, he calculated that if the IRS allowed the deduction, the purchase would ultimately cost plaintiff $1,400,000; if, however, the IRS disallowed the deduction, the stock purchase would ultimately cost $1,600,000. Kaskel testified that he discussed this matter with Kamensky and Shaw.

Shaw testified that on February 23, 1989, Martin McNally, acting then as defendants' attorney, telephoned him concerning the tax liability provision. McNally told Shaw that Berg never agreed to the provision and wanted it removed entirely. Again, Shaw consulted with Kamensky and telephoned McNally later that day. He explained to McNally that although Kamensky and he believed the provision was implicit in the agreement, they would be willing to "entertain" removing the section if Berg provided plaintiff with substantiation for his prior services in order to document the allocation of the purchase price for tax purposes. Shaw admitted, however, that plaintiff never agreed to remove the tax indemnity provision even if Berg satisfied the additional condition. According to Shaw, McNally indicated that he would contact Shaw after he discussed the matter with Berg. McNally did not telephone Shaw again on February 23.

On the morning of February 24, 1989, the scheduled closing date, as extended by the parties' consent, Shaw called McNally, who indicated that Berg was upset about the provision and that he refused to close with the added provision. Shaw testified that McNally never provided the requested substantiation for Berg's services or suggested any other alternatives.

On March 8, 1989, Charles Dreyfuss, Kamensky and Shaw held a meeting at which Dreyfuss expressed a willingness to close the deal without the tax indemnity provision and instructed his attorneys to so proceed. Kamensky, however, suggested that other alternatives first be considered. After Kamensky's request for additional time, Charles Dreyfuss rescinded the instruction to his attorneys to close the deal without the provision. Shaw, in fact, testified that neither he nor Kamensky ever offered to settle the deal on behalf of plaintiff without the tax provision.

Later in March, Berg requested a meeting at which he told Kaskel and Charles Dreyfuss that he wanted interest on the purchase price because the deal did not close as scheduled. He also requested an additional $200,000. Charles Dreyfuss testified that he did not agree to defendants' requests, telling Berg that he would have already received his money if he had allowed the transaction to close on February 24, 1989, as scheduled. Kaskel testified that Berg did not

state at this meeting that he would not close the deal with the tax provision.

Kaskel testified that he spoke with Berg on several occasions after the March meeting, attempting to close the deal. Berg told him that he was tired and wanted to delay a decision until after April 15. In early May, Berg informed Charles Dreyfuss that he was selling his shares to a third party. On May 17, 1989, plaintiff filed this suit against Berg and Wayne-Webster to compel specific performance of the January 19, 1989, agreement. Defendants filed a motion to dismiss, claiming that the written memorandum was not an enforceable contract. The court denied that motion.

As an offer of proof, Keith Berk, defendants' substituted attorney, testified that in early June he met with Kamensky to discuss closing the transaction. Berk testified that at their June 7 meeting, Kamensky told Berk that the tax indemnity provision was a "significant economic deal point," without which they "didn't have a deal." Plaintiff's counsel objected to Berk's testimony as privileged settlement negotiation and the trial court excluded it.

On February 6, 1990, the circuit court granted specific performance of the "Memorandum of Understanding," finding that plaintiff was ready, willing and able to close the transaction. Defendants filed a post-trial motion, requesting that as a condition of the specific performance plaintiff compensate defendants for rent, interest and attorney fees. The court denied defendants' motion on March 6, 1990. On April 11, 1990, the parties closed the transaction as ordered by the circuit court.

On appeal, defendants maintain that the trial court erred in granting specific performance because plaintiff failed to prove that it tendered its own performance. Defendants, however, do not seek reversal of the decree. Rather, defendants contend that by insisting on the tax liability provision, plaintiff delayed the closing from February 24, 1989, to April 11, 1990. As such, defendants maintain that the trial court improperly denied its post-trial motion to condition the grant of specific performance upon plaintiff's payment to defendants of three elements of damage: loss of use of purchase price from February 24, 1989, to April 11, 1990, loss of agreed-upon rent for same period, attorney fees and costs from February 24, 1989, forward.

■ In rendering judgment for the plaintiff, the trial court filed a memorandum opinion in which it specifically found:

> "10. The evidence establishes that plaintiff was ready, willing and able to close the transaction and acted consistently with the belief that there was a contract and the belief that it should

be closed on the terms that were agreed to on January 19, 1989."

The trial court found, and we agree, that the January 19, 1989, memorandum constituted a valid, enforceable contract. At issue in this case, however, is whether plaintiff's conduct constituted an unconditional tender of performance. Our analysis of the evidence leads us to conclude that the plaintiff was not ready, willing and able to perform under the agreed upon contract. Further, we conclude that because plaintiff's failure to tender its performance constituted a breach of contract, the trial court's award of specific performance was improper.

██ █ Generally, a plaintiff seeking specific performance of a contract must be "ready and offer to pay any sum that may be due and to comply with the contract on his part." (*Dodds v. Giachini* (1979), 79 Ill. App. 3d 358, 362, 398 N.E.2d 205, 209, *rev'd on other grounds* (1981), 84 Ill. 2d 284, 418 N.E.2d 704; *Kennedy v. Neil* (1929), 333 Ill. 629, 634, 165 N.E. 148, 151.) Although equity relaxes the technical rules of tender in order to prevent injustice, a party seeking specific performance must make a "conscientious effort on his part to comply honestly with the contract." (*Dodds v. Giachini*, 79 Ill. App. 3d at 363, 418 N.E.2d at 209; *Macy v. Brown* (1927), 326 Ill. 556, 564, 158 N.E. 216, 219.) Further, when a party attempts to impose conditions not contained in the contract, he fails to show that he complied with the contract's terms and is ready, willing and able to do the acts required by the contract. *Sullivan v. Burke* (1958), 15 Ill. 2d 101, 153 N.E.2d 824; *Arnold v. Leahy Home Building Co.* (1981), 95 Ill. App. 3d 501, 420 N.E.2d 699; *Wolford v. James E. Kolls Investment Co.* (1978), 61 Ill. App. 3d 405, 377 N.E.2d 1314.

In *Sullivan v. Burke*, the prospective purchaser of land requested specific performance of a trustee's agreement to sell the land. The trustee entered into an agreement to sell a parcel of real estate to the buyer, which provided that the buyer had 60 days from the time "after the title has been examined and found good, or accepted by [the buyer]" to pay the seller the sum of $11,500. Although buyer received an opinion of good, marketable title, he waited 105 days and then advised seller he would remit the agreed-upon purchase price only if the seller would execute a deed to buyer and deliver it to buyer's attorney. The buyer stated that he would tender the balance of the purchase price only after the deed was recorded and he received a later title report. Our supreme court concluded that the circuit court improperly ordered specific performance, writing:

"Purchasers had no right to impose conditions not contained in the contract of sale and by attempting to do so they failed to show that they had complied with the terms of the contract of sale as far as possible and that they were ready, able and willing to do the future acts required under the contract. [Citations.]" *Sullivan*, 15 Ill. 2d at 113-14, 153 N.E.2d at 831.

■■ Like the plaintiff in *Sullivan*, plaintiff in this case added a new provision to previously agreed-upon terms and refused to close on the contract terms. The January 19, 1989, handwritten document, which neither party disputes on appeal is an enforceable contract, contained no tax indemnity provision, nor did the parties discuss such a provision at the January meeting. Although plaintiff and its attorneys continued to maintain that this provision was implicit in the parties' contract, Berg repeatedly asserted that he never agreed to such terms. Plaintiff's attorney, in fact, conceded during closing arguments at trial that the provision was not a part of the contract, but was unilaterally added by plaintiff's attorney after the parties executed the January 19 agreement. Although both parties appeared interested in closing the transaction, plaintiff repeatedly failed to indicate a willingness to close the deal without the added tax indemnity provision. Plaintiff simply wanted to close the deal on its own terms. Under *Sullivan*, by attempting to impose a condition not contained in the parties' agreement, plaintiff failed to demonstrate that it was ready, willing and able to perform the contract. As such, specific performance was improper.

■■ ■ Further, in our view, the trial court improperly concluded that the plaintiff did not breach the parties' contract. The general rule is that a party's failure to perform a contract according to its terms constitutes a breach. 17A C.J.S. *Contracts* §451 (1963).

The trial court found:

"9. Defendants also claim that plaintiff breached the contract by insisting on [the tax indemnity provision] in the final contract. In this regard the Court finds that defendants have not established that plaintiff insisted on changing the terms of the January 19 contract to add [the tax indemnity provision]. Although the agents of the parties discussed that provision, the draft containing [the provision] and the deletion of that paragraph was never expressly dealt with by the parties. While there was a great deal of confusion communicated, there was not a clear statement from plaintiff in the days around February 23, 1989 or subsequent days including March 8, 1989 that it would not go ahead without [the provision] in the contract."

Unlike the trial court, we believe that plaintiff did not demonstrate, at any time from February 23, 1989, until the closing arguments on January 24, 1990, its willingness to perform pursuant to the agreed-upon contract terms nor did it offer to close without the tax provision. We conclude that plaintiff's failure to perform the contract according to its terms constitutes a breach.

■ First, we believe that the evidence demonstrates that on the scheduled closing date plaintiff was not ready, willing and able to perform the contract. When McNally, defendants' attorney, telephoned Shaw on the day before the scheduled closing to demand the removal of the added provision, Shaw told McNally that Kamensky believed the provision to be implicit in the agreement. After speaking to Kamensky, Shaw refused to remove it. Although Shaw told defendants that plaintiff would "entertain" removing the provision if defendants would agree to a different provision, Shaw conceded that plaintiff never agreed to close without the tax provision and never actually agreed to remove the provision even if defendants agreed to provide the substituted condition. Further, even if plaintiff had agreed to remove the tax provision upon defendants' agreement to the other condition, plaintiff would still not have tendered performance according to the conditions of the contract. On February 24, 1989, McNally again demanded that plaintiff remove the provision. Shaw again refused to remove it and refused to close without it. The evidence positively demonstrates that the transaction did not close as scheduled because plaintiff would not close without the unilaterally added provision. Indeed, even the testimony of plaintiff's president, Charles Dreyfuss, and its attorney, Shaw, demonstrates that the disputed tax provision was the only issue preventing the closing.

Moreover, contrary to the trial court's findings, we conclude that subsequent to the February 24, 1989, closing date, plaintiff continued to refuse to tender its performance. At the March 8 meeting of Dreyfuss, Kamensky and Shaw, even though Charles Dreyfuss knew the tax provision was the only issue which prevented the closing, he still refused to close on the agreed-upon terms. Although Dreyfuss initially agreed to remove the tax provision from the contract, Kamensky persuaded him to consider additional alternatives. Dreyfuss then rescinded his earlier instructions to close the deal.

■ Indeed, even as late as June 7, 1989, plaintiff, through its attorneys, indicated its unwillingness to close without the tax indemnity provision. As shown through an offer of proof, Keith Berk, defendants' second retained attorney, would have testified that at his June 7 meeting with Kamensky to discuss the possibility of closing the deal,

Kamensky told Berk that from plaintiff's view, the tax indemnity provision was "a significant economic deal point," without which the parties "didn't have a deal." Although the trial court excluded this evidence upon plaintiff's objection as privileged settlement negotiations, (*Barkei v. Delnor Hospital* (1988), 176 Ill. App. 3d 681, 531 N.E.2d 413), we agree with defendants that this evidentiary ruling was erroneous. The trial court deemed this evidence an offer of compromise and considered it offered for the purpose of proving the liability of the party making the offer. We find that the proffered testimony in this case did not involve an offer to compromise nor was it offered to prove the liability of any party. Rather, Berk's testimony was offered as an admission that even after filing suit, plaintiff would not close without the tax provision which it considered a crucial economic point. Because admissions, unlike offers to compromise, are admissible (*Lipschultz v. So-Jess Management Corp.* (1967), 89 Ill. App. 2d 192, 200, 232 N.E.2d 485, 489; *Domm v. Hollenbeck* (1908), 142 Ill. App. 439, 442-43, *rev'd on other grounds* (1913), 259 Ill. 382, 102 N.E. 782), the trial court improperly excluded this evidence and we may consider it on appeal.

■ In sum, plaintiff, through its attorneys, refused to close upon the terms of the parties' contract and, as such, breached the contract. Therefore, we reverse the trial court's denial of the defendants' posttrial motion requesting damages for the the loss of purchase price and rent from February 24, 1989, to April 11, 1990. We remand to the trial court and direct it to calculate damages and award them to the defendants.

■ Finally, we consider defendants' claim that the trial court improperly denied their request for attorney fees. Defendants argue that because plaintiff's conduct caused them to incur unnecessary attorney fees and costs, plaintiff should reimburse defendants for these expenses. However, defendants cite no authority for this argument. More importantly, well-settled Illinois law requires us to reject defendants' claim. A successful litigant generally may not recover fees or costs in the absence of a statute, agreement or stipulations specifically so allowing. (*Saltiel v. Olsen* (1981), 85 Ill. 2d 484, 488-89, 426 N.E.2d 1204, 1206; *Evink v. Pekin Insurance Co.* (1984), 122 Ill. App. 3d 246, 251, 460 N.E.2d 1211, 1214.) Although plaintiff breached the contract, its conduct did not rise to the level of illegal or wrongful conduct meriting an award of fees. (See *Sorenson v. Fio Rito* (1980), 90 Ill. App. 3d 368, 413 N.E.2d 47.) We thus find no reason to except the present case from the general rule that the ordinary litigant is responsible for his own attorney fees and costs.

200

The trial court's order denying defendants' post-trial motion is, therefore, reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

LaPORTA, P.J., and RAKOWSKI, J., concur.